# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Pine River Performance L.P., Pine River
Holdings L.P., and PRCM Receivables L.P.,

        Plaintiffs,

    v.                                      **MEMORANDUM OPINION AND ORDER**
                                                  Civil No. 16-3102 ADM/SER

Steven Kuhn,

        Defendant and Counterclaim-Plaintiff,

    v.

Pine River Performance L.P., Pine River
Holdings L.P., and PRCM Receivables L.P.,

        Counterclaim-Defendants,

and

Steven Kuhn,

        Third-Party Plaintiff,

    v.

Pine River Capital Management, LLC, and
Brian Taylor,

        Third-Party Defendants.

_____

Jan M. Conlin, Esq., and Barry M. Landy, Esq., Ciresi Conlin LLP, Minneapolis, MN, on behalf of Plaintiffs and Counterclaim-Defendants Pine River Performance L.P., Pine River Holdings L.P., and PRCM Receivables L.P., and Third-Party Defendant Pine River Capital Management LLC.

Benjamin B. Plaut, Esq., Law Offices of Benjamin Plaut, Manhattan Beach, CA; Andrew M. Edison, Esq., Edison McDowell & Hetherington LLP, Houston, TX; Karl L. Cambronne, Esq., and Christopher P. Renz, Esq., Chestnut Cambronne, PA, Minneapolis, MN, on behalf of Defendant, Counterclaim-Plaintiff, and Third-Party Plaintiff Steven Kuhn.

Justin H. Jenkins, Esq., Lisa B. Ellingson, Esq., and Robert R. Weinstine, Esq., Winthrop & Weinstine, PA, Minneapolis, MN, on behalf of Third-Party Defendant Brian Taylor.

## I. INTRODUCTION

On April 19, 2017, the undersigned United States District Judge heard oral argument on Plaintiffs and Counterclaim-Defendants Pine River Performance L.P., Pine River Holdings L.P., and PRCM Receivables L.P. (collectively, "Pine River" or the "Partnership"), and Third Party-Defendant Pine River Capital Management LLC's Partial Motion to Dismiss [Docket No. 49]. The Court also heard oral argument on Third-Party Defendant Brian Taylor's Motion to Dismiss [Docket No. 56]. For the reasons set forth below, the Motions are granted in part and denied in part.

## II. BACKGROUND[1]

In 2002, Brian Taylor ("Taylor") founded Pine River, a hedge fund partnership organized under Delaware law and headquartered in Minnetonka, Minnesota. Am. Countercl. Third-Party Compl. [Docket No. 43] ¶¶ 3, 10. Taylor is Pine River's CEO, managing member and 98% owner of Pine River Capital Management LLC (the "General Partner"), and a Limited Partner of Pine River with the largest Partnership Interest. Id. ¶¶ 3, 4. Steven Kuhn ("Kuhn") joined Pine River as an employee in 2008, and was admitted into the Partnership on January 1, 2009 with a 5% Partnership Interest. Id. ¶¶ 12, 13. Upon joining the Partnership, Kuhn signed the operative limited partnership agreement ("LPA") in effect at that time, as well as every other LPA presented during his time as a Limited Partner. Id. ¶ 14.

---

[1] For only the purpose of these motions, the facts set forth in Kuhn's Amended Counterclaim and Third-Party Complaint [Docket No. 43] are accepted as true.

**A. The Alleged "Partnership Percentage Increase Agreement"**

As a result of his positive performance, Kuhn's Partnership Interest grew to 17.5% by 2013. Id. ¶ 27. On February 24, 2014, Kuhn requested to meet with Taylor. Id. ¶ 29. The purpose of the meeting was to discuss a plan and a path for Kuhn to obtain a 25% equity stake in Pine River. Id.

Kuhn sent Taylor an email the following day memorializing the details of their meeting. Id. The email reads, in relevant part:

> And I thank you for agreeing to the framework below, and for having the trust in me to give me this path to 25% ownership, which has been a long time goal of mine. It means a great deal to me.
>
> Given that I will now be buying 0.75% equity this year at a rate of ▮▮▮▮/1%, I will be starting this coming year at 18.25%. At a rate of ▮▮▮▮ per 1%, we would need to generate ▮▮▮▮▮▮ of profitability for me to get to 2%--subject to max 2% growth per year with carry forwards. I will exclude sources of revenue that are new and which I had very little impact in creating – and I ask that you trust that I will be fair in judging such.

Id. at Ex. A.[2] Taylor responded in an email nine days later, stating "Yes, this sounds good to me." Id. Sometime thereafter, Kuhn forfeited a sizeable bonus and his Partnership Interest was increased by 0.75%. Id. ¶ 34. Under the LPA, Taylor, as a Limited Partner and as the General Partner, had the ability to effectuate the Partnership Interest increases contemplated in Kuhn's February 25, 2014 email. Id. ¶¶ 36, 38. Kuhn refers to this agreement as the "Partnership Percentage Increase Agreement" ("PPIA").

**B. New LPA is Signed**

In December 2014, Kuhn was presented with a new LPA that was substantially similar to

---

[2] The specific terms are redacted to protect disclosure of certain financial figures.

the prior year's LPA.  Id. ¶ 43.  Kuhn asked Pine River General Counsel Tim O'Brien ("O'Brien"), who also had ownership interests in Pine River and in the General Partner, if there was anything in the LPA that was disadvantageous to Kuhn.  Id. ¶ 43.  O'Brien, who was aware of the PPIA, said there was not.  Id.  Kuhn asked the same question to Pine River's Deputy General Counsel, who gave the same response.  Id. ¶ 45.

The LPA, however, includes the following integration clause:

> This Agreement (including any exhibits or attachments to the Agreement referenced herein) constitutes the entire understanding and agreement among the Partners with respect to the subject matter hereof, and supersedes all other prior agreements and understandings among the Partners or between any of them with respect to such subject matter.  In the event of any conflict or inconsistency between this Agreement and any other agreement by or among the Partners and/or the Partnership, the terms of this Agreement shall prevail.

Landy Decl. [Docket No. 52] Ex. 1 ("LPA") § 10.10.  Kuhn signed the new LPA.

**C. Events in 2015 and Beyond**

Kuhn alleges that although Taylor initially complied with the terms set forth in the PPIA, in 2015 Taylor began deviating from both the PPIA and the LPA.  Id. ¶ 47.  Relevant to the current Motions is Kuhn's allegation that Taylor, as General Partner, allocated bonus payments to negate the value of the Partnership Interest Kuhn had purchased pursuant to the PPIA.  Id. ¶ 58.  Kuhn additionally alleges that in 2016, Kuhn's Partnership Interest was decreased to 17.04%, where it was prior to 2014, despite Kuhn's positive performance in 2015.  Id. ¶¶ 61–63.  Finally, Taylor, again acting as General Partner, unilaterally reduced Kuhn's draw by 85% for Fiscal Year 2016, in violation of the LPA's requirement that the Limited Partner and the General Partner agree on the Limited Partner's draw amount.  Id. ¶¶ 65, 67.

On April 5, 2016, Kuhn appeared on Bloomberg television and announced that he was

4

reducing his role at Pine River. Id. ¶ 74. Kuhn and Pine River were unable to successfully resolve the financial implications of Kuhn's reduced role in the Partnership. Id. ¶ 78. Between September 5–9, 2016, Taylor obtained written proxy forms from the Limited Partners who hold over 75% of the Operating Income Percentages. Id. ¶ 83. The proxy forms of those Limited Partners gave Taylor permission to vote to approve a resolution that required Kuhn to disaffiliate and withdraw from Pine River. Id. On September 9, 2016, Taylor exercised the proxies on behalf of the Limited Partners resulting in Kuhn receiving a notice of disaffiliation from Pine River from O'Brien that same day. Id. ¶¶ 84, 88. Kuhn became the first Pine River Limited Partner to be forced out. Id. ¶ 89. This lawsuit followed.

On September 16, 2016, Pine River filed a Complaint seeking a declaratory judgment concerning Kuhn's entitlement to certain payments as set forth in the LPA. Compl. [Docket No. 1]. That claim is not subject to these Motions. On February 10, 2017, Kuhn filed the Amended Counterclaim and Third-Party Complaint, asserting six Counterclaims and Third-Party claims against Pine River, Taylor, and the General Partner for: I) breach of the PPIA; II) breach of the LPA regarding his reduced draw; III) breach of the LPA regarding mandatory disaffiliation; IV) unjust enrichment based upon the PPIA; V) breach of the implied duty of good faith and fair dealing based upon the PPIA; and VI) breach of the implied duty of good faith and fair dealing based upon the draw reduction. All but Count II of Kuhn's Counterclaims are the subject of these Motions to Dismiss.

### III. DISCUSSION

**A. Motion to Dismiss Standard and Applicable Law**

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short

5

and plain statement of the claim showing that the pleader is entitled to relief." A pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The LPA provides, and the parties agree, that Delaware law controls this dispute. LPA § 10.8(a).

## B. Breach of Contract Claims

### 1. Breach of the PPIA (Count I)

Kuhn argues that his February 25, 2014 email and Taylor's March 6, 2014 email response, "Yes, this sounds good to me," formed a valid contract (the PPIA) that Taylor and the General Partner later breached. Taylor and the General Partner challenge Kuhn's assertion that these emails formed a valid and enforceable contract. They argue that the email exchange did not create a contract because material terms are indefinite. Taylor and the General Partner also argue that the LPA's integration clause supersedes any and all prior agreements, which would include the PPIA.

Assuming without deciding that the PPIA is a valid and enforceable contract, the LPA's

integration clause bars any claim Kuhn may have under that separate agreement. The integration clause provides:

> This Agreement (including any exhibits or attachments to the Agreement referenced herein) constitutes the entire understanding and agreement among the Partners with respect to the subject matter hereof, and supersedes all other prior agreements and understandings among the Partners or between any of them with respect to such subject matter. In the event of any conflict or inconsistency between this Agreement and any other agreement by or among the Partners and/or the Partnership, the terms of this Agreement shall prevail.

LPA § 10.10. Kuhn attempts to dodge the effect of the integration clause by arguing that it applies only "In the event of any conflict or inconsistency," and that since the terms of the PPIA can be accomplished without contradicting the LPA, the integration clause does not preclude enforcement of the email contract. Kuhn's argument relies upon an overly narrow view of the integration clause.

Delaware follows "traditional principles of contract interpretation," including giving "effect to the plain meaning of a contract's terms and provisions when the contract is clear and unambiguous." ConAgra Foods, Inc. v. Lexington Ins. Co., 21 A.3d 62, 68–69 (Del. 2011). A contract term is not ambiguous "simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are . . . fairly susceptible of different interpretations or may have two or more different meanings." Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992).

The LPA's integration clause unambiguously supersedes the PPIA. Under the plain meaning of the integration clause's first sentence, it supersedes all 1) prior agreements 2) among or between the Partners 3) with respect to such subject matter. Each element is present here.

The PPIA was created prior to the operative LPA: Kuhn's email to Taylor is dated

7

February 25, 2014, Taylor's response was sent March 6, 2014, and the operative LPA was signed December 1, 2014. The PPIA is an agreement between Kuhn and Taylor, each a Limited Partner of Pine River.[3] Finally, the PPIA concerns the subject matter encompassed by the LPA. Kuhn's email outlines a method for increasing his Partnership Interest in Pine River. The LPA speaks directly to Partnership Interest. For example, § 5.1 defines the exclusive way Partnership Interests may "be issued, transferred, sold, pledged, encumbered, assigned, or otherwise disposed of." LPA § 5.1.

In H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129 (Del. Ch. 2003), an integration clause in a later agreement led to dismissal of a breach of contract claim based on an earlier document. In that case, the plaintiff executed a purchase agreement for the purchase of certain stock and warrants. Id. at 135. Statements of shareholder equity, cash flow, and further documentation were provided, and the purchase agreement explicitly represented that the financial position of the defendant company was presented fairly. Id. However, prior to signing the purchase agreement, the plaintiff received a copy of a Private Placement Memorandum that included financial figures that differed significantly from the company's actual results. Id. at 135–36. In its lawsuit, the plaintiff alleged a breach of contract claim, the theory being that the financial statements in the Private Placement Memorandum were materially misleading. Id. at 140. The court dismissed this claim based on the purchase agreement's disclosure and integration clauses. Id. at 141. The court construed the disclosure clause to exclude the financial figures in the Private Placement Memorandum from the purchase agreement's warranty

---

[3] It is irrelevant for purposes here whether Taylor's response was written in his capacity as a Limited Partner or as a General Partner. Either way, Taylor is a Partner.

provision, and construed the integration clause to exclude from the purchase agreement any representation or warranty not expressly set forth in the purchase agreement. Id.

Here, LPA section 2.5 provides that the "Partners' Operating Income Percentages . . . shall be adjusted from time to time as provided in this Agreement." LPA § 2.5. The LPA further provides that "[e]xcept as expressly set forth in this Agreement, none of the Partners has any claims for distributions, compensation or payment from the Partnership as of the date of this Agreement." LPA § 2.7. Finally, the integration clause states that the LPA "constitutes the entire understanding and agreement among the Partners with respect to the subject matter hereof, and supersedes all other prior agreements and understandings among the Partners or between any of them with respect to such subject matter." LPA § 10.10. These provisions, as in H-M Wexford, operate to bar Kuhn's claims based on the PPIA. See also Rhodes v. Silkroad Equity, LLC, No. 2133, 2007 WL 2058736, at *6 (Del. Ch. July 11, 2007) (dismissing plaintiffs' claims premised upon oral assurances made prior to a contract that included an integration clause).

The cases Kuhn cites are inapposite. For example, in Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC, an investment firm and a seed investor entered into a "Term Sheet" contract that addressed the ongoing business relationship between the two parties. No. 9742, 2015 WL 6455367, at *2 (Del. Ch. Oct. 26, 2015), aff'd in part and rev'd in part on other grounds, 151 A.3d 450 (Del. 2016). Later, the investment firm created separate corporate entities for each investment the firm elected to pursue. Id. at *4. Each separate corporate entity was governed by an individual operating agreement that was executed by the investment firm and the seed investor. Id. These operating agreements used a different mechanism than the Term Sheet to allocate investment returns. Id. at *4–5. These operating agreements also

9

included integration clauses that superseded all prior agreements with respect to the same "subject matter." Id. at *5. Later, after certain investments failed and the parties' relationship soured, the court was asked to decide which agreements controlled in light of the later agreements with the integration clauses. Id. at *18. The question turned on the breadth of "subject matter." Id. In deciding that the investment firm and the seed investor's ongoing business relationship contemplated in the Term Sheet was outside the scope of the more recent operating agreements with the integration clauses, the court in Finger Lakes held that the integration clauses in the later contracts did not fully void the first agreement. Id. at *18.

Crucial to that holding was the determination that the "subject matter" of the later agreements concerned the investment itself and "did not extend to the ongoing business relationship" between the investment firm and the seed investor. Id. That is not the case here. The PPIA is a narrow arrangement limited to increasing the percentage of Kuhn's Partnership Interest. The agreement contemplated 1) that Kuhn would immediately purchase 0.75% equity in the Partnership and 2) that Kuhn would obtain future Partnership Interest increases based on the profits he obtained for Pine River. Thus, the subject matter of the PPIA is the issuance of Partnership Interests. The LPA, however, provides the exclusive way Partnership Interests may be "issued, transferred, sold, pledged, encumbered, assigned, or otherwise disposed on." LPA § 5.1. The overlapping subject matter causes any contract that arose from the email exchange to be superseded by the LPA's integration clause.

Kuhn voluntarily assented to the terms of the subsequent LPA, including the provisions that bar enforcement of any agreement that arose from his email with Taylor. Kuhn's questions prior to signing the LPA to Pine River's General Counsel and Deputy General Counsel

demonstrates his concern that the LPA might extinguish rights he bargained for earlier.[4]  For Kuhn to rely upon any assurances he secured through his email with Taylor, he had an obligation to negotiate to preserve those rights when he was presented with the new LPA.  Count I is dismissed

### 2.  Breach of the LPA's Mandatory Disaffiliation Provision (Count III)

In Count III, Kuhn alleges that Counterclaim and Third-Party Defendants failed to follow the mandatory disaffiliation procedure in the LPA when he was ousted from the Partnership. Kuhn argues that the LPA provides that a Partner may be forced out of the Partnership only through written consent or votes at a meeting.  Kuhn contends that a third method, proxy vote, was used to remove him from the Partnership.  Counterclaim and Third-Party Defendants respond that Kuhn's disaffiliation was consistent with the LPA and Delaware law.

LPA § 6.1(b)(i) governs mandatory disaffiliation from the Partnership:  "Any Partner may be required to Disaffiliate . . . from the Partnership at any time (i) by the Consent of Partners holding 75% of the Operating Income Percentages. . . ."  LPA § 6.1(b).  Section 1.1 provides that consent "may be obtained by the counterpart written consents of Partners holding the requisite Operating Income Percentages or by the vote of such Partners at a meeting at which Partners holding at least the requisite Operating Income Percentages are present."  LPA § 1.1. The Delaware Limited Partnership statute states that "[u]nless otherwise provided in a partnership agreement, on any matter that is to be voted on by limited partners, the limited partners may vote in person or by proxy."  6 Del. C. § 17-302(e).  The crux of this dispute is

---

[4] Kuhn does not make any reliance, estoppel, or other arguments based upon the advice of Pine River's counsel.

whether the proxies complied with LPA § 6.1(b)(i).

> Each signed proxy includes the following provision and resolution:
>
> **NOW THEREFORE,** the undersigned, being a Partner of each of the Partnerships, hereby grants his or her proxy to Brian C. Taylor, with full power to act alone and to designate substitutes, the true and lawful attorneys and proxies for such Partner, to vote all shares, interests or units with respect to the following resolution, having given due consideration to the implications thereof (including (i) reviewing the terms and provisions of the LPAs, and (ii) consulting with counsel and other professional advisors, if the undersigned believe that it was necessary or advisable to do so) and intending to be legally bound, such proxy to remain in effect until the undersigned shall give Brian C. Taylor written notice of his or her withdrawal of such proxy:
>
> **BE IT RESOLVED,** that Steven Kuhn shall be required (a) to Disaffiliate as a limited partner of each of Pine River Holdings L.P. and Pine River Performance L.P., and (b) to Withdraw as limited partner of PRCM Receivables L.P., in each case effective as of a date to be determined by the General Partner.

Landy Decl. Ex. 2. These proxies fall within the LPA's language of "consent." They are "written consents" in that they are a writing signed by a Limited Partner expressing their consent that Kuhn be required to disaffiliate and withdraw from Pine River. The proxies do not merely state that the Limited Partner consents to Taylor the right to cast their vote as Taylor sees fit. Rather, each proxy expressly articulates that the Limited Partner consents to Taylor to vote to require Kuhn to disaffiliate and withdraw from the Partnership.

Kuhn argues that because 6 Del. C. § 17-302(e) allows proxies for votes "[u]nless otherwise provided in a partnership agreement," the LPA does not permit proxies. That argument may have traction if the proxies at issue were oral or if the principal did not delegate to the proxy an explicit directive on how their vote should be cast. But in this case, the proxies unequivocally express the principal's written consent to force Kuhn to disaffiliate and withdraw from Pine River. The methodology used to oust Kuhn from the Partnership complied with the

12

LPA's mandatory disaffiliation provision, § 6.1(b)(i). Kuhn's breach of contract claim related to his disaffiliation is dismissed.

## C. Unjust Enrichment, Count IV

Kuhn asserts a claim of unjust enrichment against all Counterclaim and Third-Party Defendants. Kuhn alleges that Counterclaim and Third-Party Defendants unjustly retained the benefits of the exchange contemplated in the PPIA, the money and Partnership Interest Kuhn contends he was promised. Counterclaim and Third-Party Defendants respond that unjust enrichment claims are not viable when the parties' relationship is controlled by contract. According to Counterclaim and Third-Party Defendants, since the LPA governs the selling, transferring, and assigning of Partnership Interests, Kuhn's unjust enrichment claim fails.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Schock v. Nash, 732 A.2d 217, 232 (Del. 1999) (quoting Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988)). The elements of unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010). Accordingly, a "claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." Kuroda v. SPJS Holdings, L.L.L., 971 A.2d 872, 891 (Del. Ch. 2009). "In other words, if 'the contract is the measure of [Kuhn's] right, there can be no recovery under an unjust enrichment theory independent of it.'" Id. (quoting Wood v. Coastal States Gas Corp., 401 A.2d 932, 942 (Del. 1979)).

Here, there is no contract that governs the relationship between the parties <u>that gives rise</u> to Kuhn's unjust enrichment claim. Kuhn claims that he gave up his sizeable bonus in exchange for immediate and future increases to his Partnership Interest, and that Pine River kept the money without any increase to his Partnership Interest. The impetus for this exchange did not come from the LPA but rather from Kuhn's conversation and subsequent email exchange with Taylor. Although the LPA governs how Partnership Interests may be transferred and sold and provides Taylor with the ability to increase Kuhn's Partnership Interest in accord with the email exchange, it is the email, not the LPA, that induced Kuhn to give up his bonus. Counterclaim and Third-Party Defendants' motion to dismiss the unjust enrichment claim is denied.

## D. Good Faith and Fair Dealing

In Count V, Kuhn alleges that Taylor and the General Partner breached the implied duty of good faith and fair dealing with respect to the PPIA. In Count VI, Kuhn alleges that the General Partner breached this implied duty by unilaterally reducing his draw.

The implied covenant of good faith and fair dealing is read into every contract and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." <u>Dunlap v. State Farm Fire & Cas. Co.</u>, 878 A.2d 434, 442 (Dec. 2005) (quoting <u>Wilgus v. Salt Pond Inv. Co.</u>, 498 A.2d 151, 159 (Del. Ch. 1985)). It is a "limited and extraordinary legal remedy." <u>Nemec</u>, 991 A.2d at 1128.

### 1. Count V

The implied covenant of good faith and fair dealing requires the existence of a valid contract. <u>See, e.g.</u>, <u>Kuroda</u>, 971 A. 2d at 888 ("The implied covenant of good faith and fair

14

dealing inheres in every contract. . . ."). Kuhn argues that the PPIA is the predicate contract for this claim to proceed. As determined above, however, assuming without deciding that the PPIA was a valid contract, any rights Kuhn may have had under that agreement were superseded and rendered void by the LPA's integration clause. Since the integration clause destroys the foundation Count V needs to proceed, it must be dismissed.

### 2. Count VI

This claim relates to the reduction of Kuhn's Targeted Base Distributions, or "draw," in violation of the LPA. Kuhn claims that throughout Pine River's history, until April 2016, there had been a correlation between a Limited Partner's Partnership Interest and the amount of that Limited Partner's draw. Kuhn alleges that in March 2016, the General Partner unilaterally reduced his draw by 85%, in violation of the LPA. Although the LPA provides that the General Partner and the Limited Partner must agree to the amount of the draw, the LPA does not supply guidance for resolving disagreements pertaining to a Limited Partner's draw amount. Kuhn alleges that under the implied covenant of good faith a fair dealing, discretion must be used reasonably and the General Partner's decision to reduce Kuhn's draw by 85% was an unreasonable use of that discretion.

Counterclaim and Third-Party Defendants argue in response that this claim is duplicative of Kuhn's breach of contract claim in Count II, which is not subject to these Motions to Dismiss. Counterclaim and Third-Party Defendants argue that when an implied duty claim is duplicative of an express contract claim it must be dismissed.

Counterclaim and Third-Party Defendants cite <u>Stewart v. BF Bolthouse Holdco, LLC</u> in support of dismissal. No. 8119, 2013 WL 5210220 (Del. Ch. Aug. 30, 2013). In <u>Stewart</u>,

15

plaintiff employees purchased ownership interest units in the company for approximately $25 each pursuant to a purchase agreement. Id. at *2. Under the terms of that agreement, when an employee departed the company, the company was entitled to repurchase that employee's vested ownership interests at their fair market value. Id. Fair market value was to be determined "in good faith" by the company's board after taking into account certain considerations. Id. In 2008, an offer was made to purchase the company that would have translated into each ownership interest unit being valued at approximately $1,000. Id. at *2. That deal fell through. Id. In 2010, the company president and CEO emailed plaintiffs stating that the current value of their ownership interests was approximately $200, and that if the company were able to reach its fiscal year 2013 goals, the value of each share would jump to $2,340. Id. at *3. Approximately three weeks after that email was sent, plaintiffs departed the company. Id. The company exercised its option to repurchase the employees' ownership interests and determined that the fair market value of the units was $0.00. Id. Approximately two years later, the company was acquired for approximately $1.55 billion and ownership interest units were valued at roughly $1,200 per unit. Id. at *4. Plaintiffs sued and asserted a breach of contract claim that centered on the $0.00 fair market valuation of the ownership interests. Id. Plaintiffs argued that the determination was made in bad faith and thus in breach of the purchase agreement. Id. Plaintiffs also contended that the bad faith $0.00 fair market valuation breached the implied covenant of good faith and fair dealing in relation to the fair market value provision of the purchase agreement. Id. In dismissing the implied covenant claim, Stewart held that the claim is entirely duplicative of the breach of contract claim. Id. at *16. The court in Stewart reasoned that the $0.00 valuation was either done in good faith or it was not, and if the valuation was not done in

16

good faith, plaintiffs had an viable breach of contract claim; if done in good faith, plaintiffs did not have a viable breach of contract claim.  Id.

Here, as in Stewart, Kuhn's implied covenant claim is duplicative of Kuhn's breach of contract claim in Count II.  Kuhn contends that because the LPA does not set forth a mechanism for determining a Limited Partner's draw when the Limited Partner and the General Partner do not agree on the draw amount, the implied covenant prohibits the General Partner from exercising discretion unreasonably.  The contractual "gap" Kuhn argues that should be filled by the implied covenant is wholly covered by the contract itself.  It is hard to fathom any circumstance in which the General Partner could have acted in bad faith without also breaching the LPA.  Similarly, if the General Partner did not breach the contract, then it is inconceivable how the General Partner could have violated an implied obligation to act reasonably and in good faith.  This claim is dismissed.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs and Counterclaim-Defendants Pine River Performance L.P., Pine River Holdings L.P., and PRCM Receivables L.P., and Third Party-Defendant Pine River Capital Management LLC's Partial Motion to Dismiss [Docket No. 49], and Third-Party Defendant Brian Taylor's Motion to Dismiss [Docket No. 56] are **GRANTED IN PART** and **DENIED IN PART**; and

2. Counts I, III, V, and VI in Kuhn's Amended Counterclaim and Third-Party Complaint [Docket No. 43] are dismissed with prejudice.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 29, 2017.